[Cite as *Bernard v. Cincinnati*, 2019-Ohio-1517.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DON BERNARD, | : | APPEAL NO. C-180155 |
| | | TRIAL NO. A-1700369 |
| and | : | |
| IRENE BERNARD, | : | *O P I N I O N.* |
| Plaintiffs-Appellees, | : | |
| vs. | : | |
| CITY OF CINCINNATI, | : | |
| Defendant-Appellant. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed in Part and Cause Remanded

Date of Judgment Entry on Appeal:  April 24, 2019

*Daniel E. Linneman*, for Plaintiffs-Appellees,

*Paula Boggs Muething*, City Solicitor, and *Taft Stettinius & Hollister LLP, Aaron M. Herzig, Nicholas J. Pieczonka* and *Donnell J. Bell*, for Defendant-Appellant.

**BERGERON, Presiding Judge.**

{¶1}    Aging governmental infrastructure poses problems that defy easy solution, particularly in an era of shrinking budgets.  Those problems often carry real-world consequences, as the Bernards can certainly attest in this case.  But when disputes about infrastructure arise, it prompts the question of whether the remedy lies in court or with elected representatives.

{¶2}    In this case, although the Bernards attempt to frame their claims as "proprietary" (to avoid the defense of governmental immunity), we find that most of their claims assail the city of Cincinnati ("city") for "governmental" tasks that are shielded by sovereign immunity.  The trial court accordingly erred in finding to the contrary, and we reverse in part its decision.

I.

{¶3}    Plaintiffs-appellees Don and Irene Bernard own property where they farm and board horses on Hillside Avenue situated on the west side of Cincinnati along the Ohio River.  Certain Metropolitan Sewer District of Greater Cincinnati ("MSD") sewer lines and associated manholes traverse this property.  In particular, the Muddy Creek Interceptor sits on their property and collects flows from the area's sanitary sewer pipes and combined sanitary/storm water sewer pipes.  As originally built in 1935, it operated to send wastewater, by gravity, to the Ohio River.  In 1960, the Muddy Creek Pump Station was built to send this combined wastewater to the Muddy Creek Wastewater Treatment Plant instead of directly to the Ohio River.  Shortly after this, in the early 1960s, the Army Corps of Engineers raised the river's flood stage.  Flooding conditions along the river corridor seem to grow worse each year (the famed "fifty year floods" almost appear to be annual events nowadays), and it is little wonder that aging sewer systems are not up to the task.

{¶4}     This property is located in a floodplain, and the Bernards have experienced a number of prior sewer backups, a problem unlikely to abate anytime soon.  The backup giving rise to this lawsuit occurred after heavy rainfalls (combined with snowmelt) in early March 2015.  On March 6, 2015, ten to 12 feet of water and sewage inundated their property, a condition which persisted for several weeks.  This flooding inflicted substantial damages upon the Bernards' property.

{¶5}     The Bernards initially sought redress from the city, which came out, inspected, and allegedly damaged their property further in the midst of trying to help.  When the parties proved unable to resolve their dispute, the Bernards sued, initially asserting negligence, trespass, and nuisance claims against the city.  After the city moved for summary judgment on immunity grounds, the Bernards sought and were granted leave to amend their complaint—adding claims for negligent repair and remediation, negligent maintenance related to a sinkhole, and estoppel.  Additional briefing ensued, and the trial court ultimately denied the city's motion for summary judgment, prompting the instant appeal.

II.

{¶6}     The city appeals, challenging the denial of sovereign immunity in its first assignment of error.  Our jurisdiction over this appeal stems from R.C. 2744.02(C), which provides that an order denying a political subdivision alleged immunity constitutes a final, appealable order.  We review the denial of sovereign immunity de novo.  *Hubbell v. City of Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 21.

A.

{¶7}     The Ohio Political Subdivision Tort Liability Act, R.C. 2744.01 et seq., governs the Bernards' claims.  As the Ohio Supreme Court has explained, the General

3

Assembly implemented statutory immunity protections " 'in order to ensure the continued orderly operation of local governments and the continued ability of local governments to provide public peace, health, and safety services to their residents. Am.Sub.H.B. No. 176 Section 8, 141 Ohio Laws, Part I, 1733.' " *Coleman v. Portage Cty. Engineer*, 133 Ohio St.3d 28, 2012-Ohio-3881, 975 N.E.2d 952, ¶ 13, quoting *Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 38. The parties agree that the city is a political subdivision (R.C. 2744.01(F)) entitled to general immunity against damages claims for injury or loss to persons or property as provided by statute. R.C. 2744.02(A)(1).

{¶8} The General Assembly painted with a broad brush in implementing statutory immunity: "Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." R.C. 2744.02(A)(1). This broad immunity, however, is not without limits. Pertinent here, the statute carves out from the scope of immunity those damages "caused by the **negligent** performance of acts by [the city's] employees with respect to proprietary functions of the [city]." (Emphasis added.) R.C. 2744.02(B)(2). Proprietary functions include "[t]he maintenance, destruction, operation, and upkeep of a sewer system." R.C. 2744.01(G)(2)(d). There is no exception to immunity (for present purposes), however, for governmental functions, which include "[t]he provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system[.]" R.C. 2744.01(C)(2)(l).

4

{¶9}     This case therefore poses the question of whether the alleged harm suffered by the Bernards falls on the governmental or proprietary side of the line (and if the latter, whether it was occasioned by a negligent act). Fortunately, we have guidance from the Supreme Court on this very issue. *See Coleman*, 133 Ohio St.3d 28, 2012-Ohio-3881, 975 N.E.2d 952. Much like this case, *Coleman* confronted a situation in which aggrieved landowners sued a municipality claiming that a faulty sewer system caused flooding and related damage on their property. The court appreciated that the question "is whether failure to keep a storm-sewer system functional is a 'design, construction, or reconstruction * * * [of] a sewer system' and therefore a governmental function" or whether it qualifies as "sewer 'maintenance, * * * operation, and upkeep,' " and hence proprietary. *Id.* at ¶ 18.

{¶10}     Although the Bernards attempt to distinguish *Coleman* because it originated from a motion to dismiss, rather than a summary-judgment ruling, we find this difference immaterial to our present analysis. *Coleman* supplies the governing legal framework that we must apply, whether to allegations or undisputed facts.

{¶11}     In its analysis, the Supreme Court walked through extant precedent in the sewer context, highlighting two cases from our sister districts, *Murray v. Chillicothe*, 164 Ohio App.3d 294, 2005-Ohio-5864, 842 N.E.2d 95 (4th Dist.), and *Zimmerman v. Cty. of Summit, Ohio*, 9th Dist. Summit No. 17610, 1997 WL 22588 (Jan. 15, 1997). We can distill a few basic principles from *Coleman* and this pair of cases that it builds upon. First, a design flaw (or, perhaps, a design that simply failed to account for changing conditions) squarely falls in the "governmental" bucket. Issues of design of a sewer system are accorded governmental immunity. *Coleman* at ¶ 27 (describing *Murray* as holding that "no liability can attach to the political subdivision for obsolete design").

5

{¶12} Flowing from that premise, courts must be wary about a design flaw masquerading as a maintenance problem. *Id.* at ¶ 31 ("Although creative, the Colemans' attempt to characterize their claims as ones based on maintenance fails."). After all, if any plaintiff could characterize all of the inherent flaws in a sewer system as "maintenance," it would undermine the statutory intent by stripping away immunity protections. In *Coleman*, the court distinguished between the "failure to upgrade" and "maintenance or upkeep," underscoring that upgrades and related improvements implicate "governmental" functions. *Id.* at ¶ 24. It also cited the Second District favorably in its holding that a claim sounds in "maintenance" when "remedying the sewer problem would involve little discretion but, instead, would be a matter of routine maintenance, inspection, repair, removal of obstructions, or general repair of deterioration." *Id.* at ¶ 30 (quoting Second and Fourth District authority).

{¶13} *Coleman* thus focuses our attention on whether the Bernards' harm resulted more from "routine maintenance" negligently performed or more systemic problems in the sewer system. While *Coleman* supplies this legal framework, however, it does not provide us the ultimate answer in this case because we must apply *Coleman* to the factual record at hand. To that record we now turn.

B.

{¶14} In its first assignment of error, the city argues that the trial court improperly characterized the Bernards' claims as related to the city's proprietary functions (maintenance, operation, and upkeep under R.C. 2744.01(C)(2)(l)) as opposed to its governmental functions (design, construction, or reconstruction under R.C. 2744.01(G)(2)(d)). Sifting through the record, the trial court based its ruling on the following perceived issues of material fact related to alleged negligent

maintenance, operation, and upkeep: inflow and infiltration ("I/I") issues, the operation of manholes and sewer gates, root intrusion, and pipe debris.

{¶15}    Before taking a closer look at the evidence, we pause to highlight several constraints on the Bernards' case.  While we certainly construe all of the evidence in a light most favorable to the Bernards, there is a gaping hole in the record from their perspective.   Even if we assume that they can identify examples of botched maintenance, they fail to connect those dots via causation to show that maintenance inadequacies actually *caused* their harm.  As we shall see, the record contains no material evidence establishing that the harm resulted from maintenance failures rather than basic design flaws or other systemic problems with the sewer system.

{¶16}    Typically, in a case of this nature, causation would be established by an expert witness, but the Bernards presented no such testimony.  Although we do not mean to say that the Bernards necessarily had to have an expert, since they did not, it limited their ability to establish causation, and they generally sought refuge in evidence tendered by the city.  That is particularly so given that Mr. Bernard himself admitted that when the river reaches a certain stage, his "property floods no matter what the sewer system does" and that increased river levels are a factor in sewer backups.  He also disavowed any attempt to present a causation opinion:

> Q.    So if you had to summarize your opinion of why there are overflows on your property, what is your summary of that?
>
> * * *
>
> A.    No, I couldn't answer that.  That would be – without more study of it, I couldn't answer that, no.

{¶17}    For that reason, both sides essentially debate the significance of the city's evidence.  The city relied principally upon the testimony of its expert, Mike

7

Pittinger, who served as the Wastewater Collection Superintendent for MSD. His affidavit is accompanied by a report referenced by the parties as the "BCE" (short for the "Lower Muddy Creek Interceptor SSO Remediation Business Case Evaluation") and various other MSD business records. Mr. Pittinger testified at a deposition and the record contains his expert report.[1] Gene Weber (MSD Surveyor) also testified on behalf of the city.

{¶18} The reliance on the city's evidence creates sundry problems for the Bernards. Most notably, the Bernards feature the BCE as their central piece of evidence, claiming that it chronicles certain maintenance problems that remove this dispute from the "governmental" heartland, and indeed, the trial court agreed with them on that score (repeatedly citing the BCE). But the Bernards here confront a threshold problem: the BCE is dated in June 2012—approximately three years *prior to* the flooding in issue. The BCE certainly cannot speak to conditions in 2015 or to what actually caused the Bernards' harm. Without an expert or other similar evidence to connect the BCE to the 2015 flood, the Bernards are left trying to fit the square peg of the BCE into the round hole of the 2015 conditions. For the reasons we explain more fully below, we cannot conclude that they have succeeded. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (Citations omitted.) *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 96, 585 N.E.2d 384 (1992) (citing *Anderson*).

---

[1] The Bernards challenge the court's consideration of Mr. Pittinger's expert report, because it was not incorporated by reference into an affidavit for purposes of Civ.R. 56(C). Their authority cited for this position, however, expressly allows consideration of such evidence "when there has not been any objection to the evidence." *Waller v. Thorne*, 189 Ohio App.3d 161, 2010-Ohio-2146, 937 N.E.2d 1047, ¶ 18 (9th Dist.). The Bernards did not object to the report below.

{¶19} Moreover, R.C. 2744.02(B)(2) requires a showing of negligence in the performance of proprietary functions to overcome the defense of immunity. In his deposition, Mr. Pittinger discussed the evolution of city sewer maintenance industry-wide toward a proactive, risk assessment strategy. Put differently, the city runs risk models to determine the optimal time to inspect aspects of the sewer system based on a cost/benefit analysis and historical data. Even if we were to find credible evidence in the record that certain omissions in the proprietary functions of the city could have caused the backup on the Bernards' property, a proprietary inaction falls short of a negligent action.

{¶20} Finally, the only expert in this case, Mr. Pittinger, remained unequivocal in his opinion that the "operation and maintenance of the existing MSD system/assets did not cause or contribute to the overflow from the manholes on the Muddy Creek Interceptor onto the Bernards' property in March-April of 2015." In making that determination, Mr. Pittinger highlighted exactly the type of design flaws that *Coleman* deemed governmental: "Only a series of large-scale capital improvement projects * * * will mitigate the future risk of overflows from the Muddy Creek Interceptor during periods when the Muddy Creek Basin experiences wet weather and the Ohio River is at flood stage."

1.

{¶21} Leaving aside these threshold problems for the moment, closer scrutiny of the evidence reveals other concerns with the specific, alleged factual disputes at hand. The Bernards emphasize the inflow and infiltration issues (so-called "I/I"), isolating a phrase from the BCE that "there are severe I/I problems at pipe joints." But context refutes the point made by the Bernards, as we take a brief step back to see where that phrase appears: "It has been suspected that the construction of the

interceptor was poor because of ground water conditions and that there are severe I/I problems at pipe joints. However, CCTV and Sonar inspection data gathered * * * was **unable to confirm this**, and the pipe joints inspected **appeared to be in good condition**." (Emphasis added.) We cannot turn a blind eye to the context. *See Greenwood Rehab, Inc. v. Boxell*, 6th Dist. Lucas No. L-04-1256, 2005-Ohio-2492, ¶ 29 (out-of-context deposition testimony excerpts were "unreliable" and not sufficient "to create a question of fact").

{¶22} Indeed, the balance of the BCE further undermines the basic claim because it concludes that "[o]verall, the system is functioning the way it was designed and built, although the system experiences severe I/I problems during high Ohio River Level conditions." This sounds to us very similar to the design problems at issue in *Coleman.* More to the point, the BCE details the long-standing nature of the I/I problem: "It is likely that I/I problems have been occurring since the system was originally built. I/I problem (sic) were exacerbated when the Ohio River pool stage was raised in the early 1960's (sic) due to the construction of the Markland and Meldahl Locks and Dams." A chronic problem of this nature points in favor of governmental design issues rather than negligent maintenance.

{¶23} Lest any doubt remained, the report is emphatic in its failure to attribute causation for sewer backups to I/I. After pointing to "Suspected Sources of I/I[,]" the BCE concludes that these sources "have not been confirmed" and that "[i]t is not known whether the suspected sources of I/I contribute to overflow problems." The Bernards feature this conclusion in their brief, but we do not see how it helps them. A party cannot rely on a report that professes causation "is not known" to establish causation.

{¶24} The BCE discusses the possibility of lining the 8,450 feet of sewer piping to address I/I, but concludes: "removing all I/I from the system is not required for the pressure capable sewer system to function properly because overflows are being consolidated rather than controlled." Only completely revamping the sewer system, at a multi-hundred million dollar price tag, might control the overflows. But that is squarely within the "governmental" function according to *Coleman*. "[T]he failure to upgrade is different from failure to maintain or upkeep." *Coleman*, 133 Ohio St.3d 28, 2012-Ohio-3881, 975 N.E.2d 952, at ¶ 24.

{¶25} Finally, the Bernards emphasize a quote from Mr. Pittinger's deposition where he acknowledged, in a general sense, that pipes ordinarily should not permit the escape of sewage from them. Coupled with Mr. Bernard's recollection that he saw sewage enter his property through the ground, they argue they have therefore identified a genuine issue of material fact (almost akin to a res ipsa loquitur argument). Yet the Bernards fail to take the next, and critical, step to show how an acknowledgement of a hypothetical issue is tantamount to evidence that the city actually caused the pipes at issue to function improperly. Moreover, just because a pipe fails or does not perform optimally does not establish negligence in the immunity context.

2.

{¶26} The Bernards also turn exclusively to the BCE for evidence that open manholes contribute to sewer backups. Many manholes in the vicinity of the Bernards' property apparently have unbolted lids that allow overflow to occur upstream of the pump station during river flooding. While open manhole covers certainly contribute to I/I, their contribution begins after the flooding/overcapacity event. The BCE qualifies their contribution to I/I as occurring "if Ohio River levels rise above the

manhole rim." They are properly viewed as a symptom, rather than the cause, of the backup on the Bernards' property. According to Mr. Pittinger's report: "The MSD system overflowed from the manholes because wet weather flow * * * exceeded the system's designed maximum pumping capacity at a time that the designed 'relief overflow' * * * was restricted by the Ohio River's flood stage." It is evident from the record that simply resecuring the manhole covers would not remedy the underlying issues that cause sewer backups on the property. The portions of the BCE cited by the Bernards discuss the interplay between open manhole covers and I/I, but they do not establish genuine factual issues as to whether the open manhole covers caused the March 2015 sewer backup. If anything, the two paragraphs quoted by the Bernards in the BCE both discuss manholes in the context of "peak flows" and a rising Ohio River. There is no indication that the sewer backups resulted from an act committed by the city related to these manholes independent of flooding conditions—let alone a negligent act.

3.

{¶27} Next, the Bernards refer to two malfunctioning gates in the sewer system on their property, also noted by the trial court. In this respect, they again rely on the BCE as the foundation for this point, latching on to the BCE's assessment of a flapgate and sluice gate as a major sources of I/I in flooding conditions as evidence of causation. But according to Mr. Pittinger, the functioning of the flapgate was irrelevant at the time of the 2015 overflows due to the river's elevation. And regardless of whether the faulty flapgate previously contributed to I/I, it had been repaired by the March 2015 incident. Likewise, the increased Ohio River stage in March 2015 rendered the sluice gate effectively obsolete, regardless of its functionality. Given that Mr. Pittinger evaluates these issues at the time of the March 2015 flooding event, the

12

Bernards cannot defeat summary judgment by simply referring back to the outdated 2012 BCE. They marshal no other competent evidence to generate a material dispute of fact on this point, and notably they fail to respond in their brief to the city's discussion of Mr. Pittinger's testimony on this score.

4.

{¶28}     With respect to debris and root intrusion, the Bernards again feature the BCE, as well as one page from an MSD proposal, for evidence that these conditions caused their damages. The former simply notes the fact of debris, and the latter describes cleaning debris as part of a proposal to "reduce the frequency and/or duration of overflows," but not eliminate them. Critically, neither points definitively to debris as the cause of the backups—the MSD proposal passage even noting in the portion cited by the Bernards that "water level remains high much of the time" near where debris was found. Perhaps most importantly, the BCE states that debris is "not a major source of overflows" and is suspected to be the result of the associated, overloaded pump station. The BCE proposes cleaning 8,450 feet of pipe only as part of a temporary fix that would consolidate, *but not control*, overflow. Mr. Pittinger testified that he considered the debris referred to in the BCE as "transient," meaning it would wash away in the ordinary course; there was "no indication of consistent hardpan debris." The fact that this alleged maintenance issue is transient makes it especially unconvincing as a genuine issue of material fact in light of the fact that the BCE preceded (by almost three years) the backup at issue. Mr. Weber likewise echoed that "having debris in the sewer system is not uncommon."

{¶29}     As to root intrusion, Mr. Pittinger explains in his deposition: "I'm not aware of any root intrusion." Later, he discusses the fact that root intrusion upstream

13

would have the practical effect of benefitting the Bernards, as it would lower the need to release system pressure through manholes on their property.

{¶30}     The fact that the BCE and MSD proposal discuss pipe debris and root intrusion does not generate a material issue of fact that debris or root intrusion caused the Bernards' 2015 damages.  We cannot conclude that the BCE and MSD proposal, when read and considered as a whole, establish a genuine issue of material fact regarding debris or root intrusion as raised by the Bernards and cited by the trial court.

5.

{¶31}     In their amended complaint, cognizant of the specter of the city's immunity defense, the Bernards presented a negligent maintenance claim related to an alleged sinkhole on their property.  While Mr. Pittinger and Mr. Weber discuss potential sinkholes in their depositions, neither conclusively attributes the sinkholes to a negligent act undertaken by the city.  The Bernards offer no evidence to the contrary, other than Mr. Bernard testifying that he saw sewage coming through the ground on his property.  Without more, we cannot conclude that this lay observation constitutes material evidence that negligence related to an alleged sinkhole caused their 2015 sewer backup damages.

6.

{¶32}     We have no doubt that the Bernards have suffered real harm here, but they cannot present the simple fact of harm as sufficient proof to survive an immunity defense, particularly in light of the proprietary-governmental dichotomy.  A comprehensive and integrated review of the record demonstrates that the issues emphasized by the Bernards fall short of raising genuine issues of material fact.  Put differently, reasonable minds reviewing this record—in a light most favorable to the Bernards—are left with the distinct conclusion that a total sewer system overhaul, and

14

not regular, routine maintenance, is the only possible answer (if any) to the Bernards' unfortunate predicament. The BCE acknowledges several times that a property-by-property approach to remedying sewer backups would only serve to alleviate one property owner's "problem at the expense of another." In other words, a band-aid that might help the Bernards could well harm their neighbors. For good or ill, we trust governments to make these types of public policy decisions, and this further demonstrates that the claims at bar can be redressed only by redesign or reconstruction—prototypical governmental functions according to *Coleman*. *Coleman*, 133 Ohio St.3d 28, 2012-Ohio-3881, 975 N.E.2d 952, at ¶ 30.

## III.

{¶33}     We now address the two remaining counts not covered by the analysis above (counts IV and VI). In the proceedings below, the trial court granted the Bernards leave to amend their complaint subsequent to the initial briefing on the city's motion for summary judgment on immunity grounds. The amended complaint added counts for negligent repair and remediation and estoppel (in addition to the negligent maintenance related to a sinkhole issue covered above). Both sides submitted supplemental briefing in the wake of this filing. The trial court issued a blanket denial of summary judgment on the immunity defense, and it did not parse each count individually.

{¶34}     The city's motion for summary judgment argued for immunity based upon the alleged sewer backup damages being grounded in governmental functions of the city. Counts IV (negligent repair and remediation) and VI (estoppel) of the amended complaint, by contrast, assert damages of a different character—those caused by the city's alleged negligent remediation after the sewer backup and those caused by reliance on the city's alleged promises regarding remediation. The city

conceded in its reply brief here that counts IV and VI "do not affect the subject of this appeal" and that "the Court should grant judgment in the city's favor on all claims related to damage caused by the sewer overflows," and it reiterated this position at oral argument. Based on this concession, we find that the appeal before us challenges only the trial court's ruling on counts I–III and V of the amended complaint, and we have no occasion to pass upon the merits of the conclusions in counts IV and VI. We leave it to the trial court on remand to conduct further proceedings on those counts consistent with this opinion.

IV.

{¶35} As acknowledged with respect to the plaintiffs in *Coleman*, we are cognizant of the extraordinary damage that the Bernards are left to manage in the wake of this decision. *See Coleman*, 133 Ohio St.3d 28, 2012-Ohio-3881, 975 N.E.2d 952, at ¶ 32 ("[W]e are not unmindful that damages suffered by homeowners like the Colemans can be devastating to property and possessions, as well as physical and mental health."). It is a reality, unfortunately, not unique in the harsh context of immunity. *Inwood Village, Ltd. v. Cincinnati*, 1st Dist. Hamilton No. C-110117, 2011-Ohio-6632, ¶ 10. Nevertheless, this court cannot impose liability where the legislature has intentionally proscribed it. *See Coleman* at ¶ 33. The city is immune from the liability asserted in counts I–III and V of the Bernards' amended complaint under R.C. 2744.02(A)(1); the city's first assignment of error is therefore sustained. Because we find that immunity attaches under R.C. 2744.02(A)(1), we do not reach the city's arguments relative to R.C. 2744.03(A)(5) in its second assignment of error, and deem that moot. The judgment of the trial court is reversed as to counts I–III and V, and we remand counts IV and VI for further proceedings consistent with this opinion.

Judgment reversed in part and cause remanded.

16

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:
The court has recorded its own entry this date.

